## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. _____

| | |
|---|---|
| JUAN PERDOMO, Individually and on Behalf of All Others Similarly Situated, | (JURY TRIAL DEMANDED) |
| Plaintiff, | |
| vs. | |
| ADT INC., APOLLO GLOBAL MANAGEMENT LLC, TIMOTHY J. WHALL, JEFFREY LIKOSAR, MARC E. BECKER, REED B. RAYBIN, MATTHEW H. NORD, ANDREW D. AFRICK, ERIC L. PRESS, LEE J. SOLOMON, STEPHANIE DRESCHER, BRETT WATSON, DAVID RYAN, and P. GRAY FINNEY, | |
| Defendants. | |

## CLASS ACTION COMPLAINT FOR
## VIOLATION OF THE FEDERAL SECURITIES LAWS

### INTRODUCTION

1.      Plaintiff, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by ADT Inc. ("ADT" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

### SUMMARY OF THE ACTION

2.      Plaintiff brings this securities class action on behalf of persons who purchased or otherwise acquired ADT common stock pursuant or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with ADT's January 2018 initial public offering (the "Offering" or "IPO").

3.     The action asserts non-fraud, strict liability claims under §§11, 12, and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act"), against ADT, certain ADT officers and directors, and the sponsor of the IPO, Apollo Global Management LLC ("Apollo Global").

4.     ADT is a home security company taken private by Apollo Global in May 2016, and quickly taken public again via the January 2018 IPO. ADT's common stock now trades on the New York Stock Exchange under the ticker "ADT."

5.     In January 2018, Defendants commenced the IPO, issuing approximately 105 million shares of ADT common stock to the investing public at $14 per share, all pursuant to the Registration Statement.

6.     The Registration Statement contained untrue statements of material fact and omitted to state material facts both required by governing regulations and necessary to make the statements made not misleading. The Registration Statement portrayed ADT as having undergone a "***transformation***," that it had become a "***New ADT***," "***substantially improved***," "combin[ing] the brand, history, and scale of legacy ADT with [improved] customer service and operational excellence . . . to create an industry leader with the broadest portfolio, largest scale, and ***leading financial and operating metrics***." It touted that "the new management team ha[d] notably improved customer retention, ***reduced customer acquisition costs and improved profitability***," and further that "these strategies ha[d] ***already delivered significant improvements in operational and financial results***."

7.     The Registration Statement also touted the following comparative metrics:

**Improved Operational and Financial Metrics**. Comparing pre-acquisition Legacy ADT (as defined below) for its fiscal year ended September 25, 2015 to post-acquisition Legacy ADT (as defined below) in the trailing twelve-month period ended September 30, 2017, we reduced gross customer revenue attrition from 16.5% to 13.9%. In addition, . . . we increased Adjusted EBITDA margins as a percentage of monitoring and related services revenues from 54.1% to 57.6%, and we reduced the customer revenue payback period from 2.7 years to 2.5 years. We also reduced total net capital expenditures as a percentage of Adjusted EBITDA and improved our cash flow.

\*      \*      \*

**Reduced Customer Revenue Attrition.** As a result of a combination of (i) increased discipline related to the credit quality of the new customers we acquire, . . . (ii) improved customer service, . . . and (iii) a technology-driven product and service offering . . ., we have improved annual customer revenue attrition at legacy ADT by more than two and a half percentage points since the consummation of the ADT Acquisition. Customer revenue attrition is one of the most important drivers of value creation in security monitoring businesses, and based on our estimates every one percentage point improvement in attrition frees up more than $100 million of cash flow we would otherwise need to spend to replace those lost customers.

8. The Registration Statement also provided "preliminary estimated ranges" of ADT's FY 2017 financial results,[1] including a range for FY 2017 net income with a low end of $86,832,000 to a high end of $550,832,000. With respect to these estimates, the Registration Statement further claimed as follows:

"We have presented preliminary estimated ranges of certain of our financial results [] for the year ended December 31, 2017 *based on information currently available to management*."

9. The Registration Statement also purported to warn of numerous risks that "*if*" occurring "*might*" or "*could*" materially affect the Company. For example, the Registration Statement stated:

- "U.S. federal tax reform *could adversely affect us*."

- "The impact [of the Trump tax cut][2] on the year ended December 31, 2017 and on future years *may be material* to the consolidated financial statements."

- "[O]ur actual results for the year ended December 31, 2017 *may differ materially* from the preliminary estimated financial results."

10. All of the foregoing statements were false and misleading because, far from transformative improvement, ADT was in fact already experiencing (yet failed to disclose) dramatically worse financial results. Indeed, without the one-time boost of the Trump tax cut,

---

[1] ADT's 2017 quarterly and full year financial results are referenced as "4Q 2017" and "FY 2017," respectively.

[2] On December 22, 2017, President Trump signed into law H.R. 1, originally known as the "Tax Cuts and Jobs Act," which legislation significantly reformed the Internal Revenue Code of 1986, as amended. It is referenced herein as the "Trump tax cut" or "tax reform."

ADT would fall far short of even the extreme low end of the 2017 net income and earnings ranges portrayed in the Registration Statement.  Rather than net income of $86-$550 million, ADT would in fact suffer *a net loss of over $300 million*.  Rather than a quarterly profit of $0.14 EPS, ADT would in fact suffer *a quarterly loss of $0.06 EPS*.  And rather than the portrayed year-over-year profit increase, ADT would in fact suffer *increasing year-over-year losses* of $0.35 diluted EPS for FY 2017 - *down 75% from 2016*.

11.     The Registration Statement compounded these material misrepresentations and omissions by failing to disclose historical metrics integral to appraising ADT "key value drivers." Whereas, before going private in 2016, ADT had long provided both unit and revenue attrition metrics, the Registration Statement provided only gross customer revenue attrition.  Whereas ADT had historically provided quarterly subscriber counts, the Registration Statement provided none at all. And whereas ADT had long provided (and emphasized) gross additions broken down by channel as well as subscriber acquisition cost, the Registration Statement did not.  By failing to provide these important metrics, Defendants prevented investor and market analysts from accurately appraising the state of ADT's business and financial performance.

12.     Defendants were required to disclose this material information in the Registration Statement for at least three independent reasons.  First, SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required disclosure of any known events or uncertainties that at the time of the IPO had caused or were reasonably likely to cause ADT's disclosed financial information not to be indicative of future operating results.  The then complete yet undisclosed materially negative 4Q and FY 2017 results and trends were likely to (and in fact did) materially and adversely affect ADT's results and prospects and rendered the 2017 estimated ranges in the Registration Statement's misleading and not indicative of ADT's future operating results.

13.     Second, SEC Regulation S-K, 17 C.F.R. §229.503 ("Item 503"), required, in the "Risk Factor" section of the Registration Statement, a discussion of the most significant factors that make the offering risky or speculative and that each risk factor adequately describe the risk. ADT's discussions of risk factors did not even mention, much less adequately describe the risk posed by, the then already occurring 75% increase in year-over-year losses, nor the other complete

- 4 -

yet undisclosed materially negative 4Q and FY 2017 results and trends, nor ADT's dependence on the Trump tax cut to meet even the extreme low end of its 2017 estimate ranges, nor the omission of historically critical metrics, nor the likely and consequent materially adverse effects on the Company's future results, share price, and prospects.

14.     Third, Defendants' failure to disclose the then complete materially negative 4Q and FY 2017 results and trends, and ADT's dependence on the Trump tax cut to meet even the extreme low end of its 2017 estimate ranges, much less the likely material effects they would have on ADT's share price, rendered false and misleading the Registration Statement's many references to known risks that "*if*" occurring "*might*" or "*could*" affect the Company. These "risks" had already materialized at the time of the IPO.

15.     With these misrepresentations and omissions, the IPO was extremely lucrative for Defendants, who raised more than $1.4 billion in gross proceeds.

16.     But when the truth of Defendants' misrepresentations and omissions became known, the price of ADT shares suffered sharp declines. By the commencement of this action, ADT shares traded below $9 per share, an over 35% decline from the offering price. All told, investor suffered hundreds of millions of dollars in losses.

**JURISDICTION AND VENUE**

17.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1331.

18.     This Court has personal jurisdiction over Defendants and venue is proper because Defendants reside or are headquartered in this District, Defendants and their agents affirmatively solicited and sold the subject securities and Registration Statement to investors in Florida and this District and those contacts have a substantial connection to the claims alleged herein, and, in connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

19.     Plaintiff, as set forth in the attached shareholder certification, purchased ADT shares pursuant or traceable to the IPO and was damaged thereby.

20.     Defendant ADT is an electronic security system company incorporated under the laws of Delaware.  ADT's history traces back to the American District Telegraph Company, formed in 1874 as a consortium of 57 telegraph operators.  After over a century in business and a series of acquisitions and mergers, ADT became a public company in September 2012. Throughout its prior tenure as a public company, ADT characterized its business as a recurring revenue business, where approximately 90% of its revenue is generated from its multi-year customer contracts, and emphasized five key value drivers for its subscription-based business model: customer additions, costs to add a new customer (known as subscriber acquisition costs or "SAC"), average revenue per customer, costs incurred to provide service to customers, and customer tenure.  In May 2016, Defendant Apollo Global, a private equity firm, acquired ADT in a leveraged buyout, after which ADT became a privately owned company and thus ceased trading publicly.  Through the IPO, ADT was spun off by Apollo Global and again became a public corporation, trading publicly on the New York Stock Exchange under the ticker "ADT."

21.     Defendant Apollo Global is the private equity firm that took ADT private in a leveraged buyout in May 2016 and then quickly took ADT public again via the January 2018 IPO. Apollo Global exercises control over ADT, its officers, and its board of directors.  Apollo Global appointed a majority of ADT's board of directors and, through affiliated funds, continues to own a majority of the voting power of ADT's outstanding common stock. As a result, ADT is a "controlled company" – *i.e.*, controlled by Apollo Global - under the corporate governance rules for NYSE-listed companies and for purposes of the federal securities laws.

22.     Defendant Timothy J. Whall is the Chief Executive Officer and a director of ADT. He reviewed, contributed to, and signed the Registration Statement.

23.     Defendant Jeffrey Likosar is the Chief Finanicial Officer of ADT.  He reviewed, contributed to, and signed the Registration Statement.

24.     Defendant Marc E. Becker is a director of ADT and a designee of Apollo Global. He reviewed, contributed to, and signed the Registration Statement.

25.     Defendant Reed B. Raybin is a director of ADT and a designee of Apollo Global. He reviewed, contributed to, and signed the Registration Statement.

26.     Defendant Matthew H. Nord is a director of ADT and a designee of Apollo Global. He reviewed, contributed to, and signed the Registration Statement.

27.     Defendant Andrew D. Africk is a director of ADT and a designee of Apollo Global. He reviewed, contributed to, and signed the Registration Statement.

28.     Defendant Eric L. Press is a director of ADT and a designee of Apollo Global.  He reviewed, contributed to, and signed the Registration Statement.

29.     Defendant Lee J. Solomon is a director of ADT and a designee of Apollo Global. He reviewed, contributed to, and signed the Registration Statement.

30.     Defendant Stephanie Drescher is a director of ADT and a designee of Apollo Global.  She reviewed, contributed to, and signed the Registration Statement.

31.     Defendant Brett Watson a director of ADT.  He reviewed, contributed to, and signed the Registration Statement.

32.     Defendant David Ryan is a director of ADT.  He reviewed, contributed to, and signed the Registration Statement.

33.     Defendant P. Gray Finney is the Chief Legal Officer of ADT.  He reviewed, contributed to, and signed the Registration Statement.

34.     The Defendants named in ¶¶ 22-33 are referred to herein as the "Individual Defendants."  The Individual Defendants each signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other

- 7 -

promotions to meet with and present favorable information to potential ADT investors, all motivated by their own and the Company's financial interests.

## DEFENDANTS' FALSE AND MISLEADING
## REGISTRATION STATEMENT AND PROSPECTUS

35.     On September 28, 2017, Defendants filed with the SEC a confidential draft Registration Statement on Form S-1, which would be used for the IPO following a series of amendments in response to SEC comments, including comments from the SEC emphasizing the importance of adequately disclosing material trends and risk factors, as required by Items 303 and 503.

36.     On or about January 17, 2018, Defendants filed a final amendment to the Registration Statement, which registered 105 million ADT common stock shares for public sale. The SEC declared the Registration Statement effective on January 18, 2018.  On or about January 19, 2018, Defendants priced the IPO at $14 per share and, January 22, 2018, filed the final Prospectus for the IPO, which forms part of the Registration Statement.  On January 23, 2017, the Company completed the IPO, which, upon the underwriters declining to exercise their overallotment option to purchase additional shares, issued a total of 105 million shares, generating over $1.47 billion for Defendants.

37.     The Registration Statement contained untrue statements of material fact and omitted to state material facts both required by governing regulations and necessary to make the statements made not misleading.  The Registration Statement portrayed ADT as having undergone a "***transformation***," that it had become a "***New ADT***," "***substantially improved***," "combin[ing] the brand, history, and scale of legacy ADT with [improved] customer service and operational excellence . . . to create an industry leader with the broadest portfolio, largest scale, and ***leading financial and operating metrics***."   It touted that "the new management team ha[d] notably improved customer retention, ***reduced customer acquisition costs and improved profitability***," and further that "these strategies ha[d] ***already delivered significant improvements in operational and financial results***."

38.     The Registration Statement also touted the following comparative metrics:

**Improved Operational and Financial Metrics**. Comparing pre-acquisition Legacy ADT (as defined below) for its fiscal year ended September 25, 2015 to post-acquisition Legacy ADT (as defined below) in the trailing twelve-month period ended September 30, 2017, we reduced gross customer revenue attrition from 16.5% to 13.9%. In addition, . . . we increased Adjusted EBITDA margins as a percentage of monitoring and related services revenues from 54.1% to 57.6%, and we reduced the customer revenue payback period from 2.7 years to 2.5 years. We also reduced total net capital expenditures as a percentage of Adjusted EBITDA and improved our cash flow.

*       *       *

**Reduced Customer Revenue Attrition.** As a result of a combination of (i) increased discipline related to the credit quality of the new customers we acquire, . . . (ii) improved customer service, . . . and (iii) a technology-driven product and service offering . . ., we have improved annual customer revenue attrition at legacy ADT by more than two and a half percentage points since the consummation of the ADT Acquisition. Customer revenue attrition is one of the most important drivers of value creation in security monitoring businesses, and based on our estimates every one percentage point improvement in attrition frees up more than $100 million of cash flow we would otherwise need to spend to replace those lost customers.

39.     The Registration Statement also provided "preliminary estimated ranges" of ADT's FY 2017 financial results, including a range for FY 2017 net income with a low end of $86,832,000 to a high end of $550,832,000. With respect to these estimates, the Registration Statement further claimed as follows:

"We have presented preliminary estimated ranges of certain of our financial results [] for the year ended December 31, 2017 *based on information currently available to management*."

40.     The Registration Statement also purported to warn of numerous risks that "*if*" occurring "*might*" or "*could*" adversely affect the Company while failing to disclose that these very "risks" had already materialized at the time of the IPO. For example, the Registration Statement stated:

- "U.S. federal tax reform *could adversely affect us*."

- "The impact [the Trump tax cut] on the year ended December 31, 2017 and on future years *may be material* to the consolidated financial statements."

- 9 -

- "[O]ur actual results for the year ended December 31, 2017 *may differ materially* from the preliminary estimated financial results."

41. All of the foregoing statements were false and misleading because, far from transformative improvement, ADT was in fact already experiencing (yet failed to disclose) dramatically worse financial results. Indeed, without the one-time boost of the Trump tax cut, ADT would fall far short of even the extreme low end of the 2017 net income and earnings portrayed in the Registration Statement. Rather than net income of $86-$550 million, ADT was in fact suffering *a net loss of over $300 million*. Rather than a quarterly profit of $0.14 EPS, ADT was in fact suffering *a quarterly loss of $0.06 EPS*. And rather than the portrayed year-over-year profit increase, ADT was in fact suffering *increasing year-over-year losses* of $0.35 diluted EPS for FY 2017 - *down 75% from 2016*. As such, contrary to the statements made in the Registration Statement, the estimated FY 2017 ranges did not reflect critical information already available to ADT's management, the Trump tax cut was already certain to have a material impact on ADT's 4Q and FY 2017 financial results, and, as a result, ADT's 4Q and FY 2017 financial results did indeed differ materially from the estimated financial results portrayed in the Registration Statement.

42. Defendants were required to disclose this material information in the Registration Statement for at least three independent reasons. First, SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required disclosure of any known events or uncertainties that at the time of the IPO had caused or were reasonably likely to cause ADT's disclosed financial information not to be indicative of future operating results. The then complete yet undisclosed materially negative 4Q and FY 2017 results and trends were likely to (and in fact did) materially and adversely affect ADT's results and prospects and rendered the 2017 estimated ranges in the Registration Statement's misleading and not indicative of ADT's future operating results.

43. Second, SEC Regulation S-K, 17 C.F.R. §229.503 ("Item 503"), required, in the "Risk Factor" section of the Registration Statement, a discussion of the most significant factors that make the offering risky or speculative and that each risk factor adequately describe the risk. ADT's discussions of risk factors did not even mention, much less adequately describe the risk

posed by, the then already complete 75% increase in year-over-year losses, nor the other complete yet undisclosed materially negative 4Q and FY 2017 results and trends, nor ADT's dependence on the Trump tax cut to meet even the extreme low end of its 2017 estimate ranges, nor the omission of historically critical metrics, nor the likely and consequent materially adverse effects on the Company's future results, share price, and prospects.

44.     Third, Defendants' failure to disclose the then complete yet undisclosed materially negative 4Q and FY 2017 results and trends, nor ADT's dependence on the Trump tax cut to meet even the extreme low end of its FY 2017 estimate ranges, much less the likely material effects these omissions would have on ADT's share price, rendered false and misleading the Registration Statement's many references to known risks that "*if*" occurring "*might*" or "*could*" affect the Company. These "risks" had already materialized at the time of the IPO.

45.     Notwithstanding these risks, Defendants went forward with the IPO with the foregoing misrepresentations and omissions in the Registration Statement.     With these misrepresentations and omissions, the IPO was extremely lucrative for Defendants, who raised more than $1.4 billion in gross proceeds.

46.     But in the wake of the IPO, analysts expressed concern at the opaque Registration Statement and its failure to include historical metrics integral to understanding and appraising ADT's underlying business results. For example, in February 2017, media reports quoted Stifel Nicolaus analyst Schlomo Rosenbaum as follows:

> Stifel struck a more cautious tone in a note offered as a primer on . . . the questions raised by ADT's IPO prospectus.
>
> Analyst Shlomo Rosenbaum compared what is the same at ADT as compared with when it was public before with what has changed and found *it no longer makes certain disclosures that would clearly help understand the state of the underlying business*. . . .
>
> For example, the company *used to provide unit and revenue attrition metrics, but now only provides gross customer revenue attrition*, he said. *Subscriber counts were provided on a quarterly basis in the past, but are not provided at all now*. "We believe the subscriber base in terms of units has been shrinking," he wrote.
>
> Gross additions were another feature of quarterly reports with a breakdown of how many came from the dealer channel and how many from the internal channel, said Rosenbaum. *The company is no longer providing an update of*

*subscriber acquisition costs*. And its debt levels have significantly increased thanks to the LBO, he said.

> "*Since the key drivers of the business are subscriber acquisition costs, average revenue per subscriber (or recurring monthly revenue, also known as RMR), and attrition, we believe it is tough to gauge what is really going on in the business from public filings*," said Rosenbaum.

47. On February 13, 2018, analysts with Imperial Capital issued a report echoing these same concerns and specifically emphasized the risks of "missed quarters" posed by Defendant opaque nondisclosures as follows:

> *ADT is providing less granular metric transparency* than previous iterations of the company. *The market may be less forgiving of "missed" quarters without the ability to investigate individual metrics than before*. Ultimately, we would like to see ADT provide more details in its filings, including greater divisional data on residential and commercial industrial, average revenue, and cost to serve per subscriber, the take rate of Pulse, performance of the organic ADT business on measures like revenue growth and attrition.

48. On these concerns and risks, the price for ADT shares declined over 12%, from a high of $12.80 on February 13, 2017 down to a low of 11.24 on February 15, 2017.

49. Still, given the Registration Statement's opacity, investors were left to wonder what, if anything, Defendants were hiding. Because Defendants still had not released ADT's undisclosed (yet complete and internally known) 4Q and FY 2017 results, the public market was left uncertain as whether the statements, metrics, and estimated ranges touted in the Registration Statement were reliable and accurately reflective of ADT's financial results. Investors could not know that, far from the transformative improvement touted in the Registration Statement, ADT was in fact experiencing far worse financial results. Investors could not know ADT's utter dependence on the one-time boost of the Trump tax cut to come anywhere near the extreme low end of the FY 2017 net income and earnings ranges portrayed in the Registration Statement. Investors could not know that, without that one-time boost, rather than net income of $86-$550 million, ADT was in fact suffering *a net loss of over $300 million*. Investors could not know that rather than a quarterly profit of $0.14 EPS, ADT was in fact suffering *a quarterly loss of $0.06 EPS*. Investors could not know that rather than the portrayed year-over-year profit increase, ADT

was in fact suffering *increasing year-over-year losses* of $0.35 diluted EPS for FY 2017 - *down 75% from 2016*.

50.     When these truths ultimately emerged, ADT's shares plummeted.  On March 15, 2018   ADT announced its disappointing 4Q and FY 2017 earnings and other financial results as follows:

Fourth Quarter 2017 Results

*     *     *

The Company reported net income of $638 million, up from negative $85 million last year, and diluted earnings per share of $0.99 versus $(0.13) in the prior year.  *Excluding special items, diluted earnings per share was $(0.06) versus $(0.07) in the same period last year.*  The net income results include a $690 million tax benefit due to the 2017 Tax Reform.

*     *     *

Full Year 2017 Results

On a full year basis, the Company reported total revenue of $4,316 million and M&S Revenue of $4,029 million, up 4% and 2%, respectively, when compared to 2016 pro forma results.  Adjusted EBITDA increased by $176 million, or 8%, to $2,353 million.  Net income was $343 million, up from a net loss of $285 million, and diluted earnings per share of $0.53, up from $(0.44) last year.  *Excluding special items, diluted earnings per share for the year was $(0.35) compared to $(0.20) in 2016.*  Operating cash flow was $1,592 million, up 39% year-over-year, and free cash flow before special items was $403 million, up from $331 million in 2016.

51.     On this news, the price for ADT shares declined nearly 20%, from a high of $10.72 per share on March 15, 2017 down to a low of $8.63 per share on March 16, 2017.

52.     Market analysts reacted negatively, lowering forecasts and share price targets.  For example, later that day, March 15, 2017, Investors Business Daily published an article titled "Alarming Numbers: ADT Reports Surprise Loss In First Earnings Report Since IPO."  In the article, market analyst Aparna Narayanan reacted as follows:

"Home security company ADT Inc. reported *a surprise adjusted loss* for the fourth quarter, its first quarterly report since coming public in January. . . *Analysts had expected earnings of 14 cents per share* on revenue of $1.09 billion . . . *But ADT lost 6 cents a share excluding one-time items*."

- 13 -

53.     That same day, MarketWatch.com published an article headlined "ADT shares slide

. . . after disappointing investors with adjusted quarterly loss," in which editor Ciara Linnane summarize

as follows:

> "[T]he company posted ***a surprise adjusted loss for the fourth quarter***. ADT
> said it had net income of $638 million, or 99 cents a share, for the quarter, after
> a loss of $85 million, or 13 cents a share, in the year-earlier period. The number
> included a $690 million tax benefit from the December tax revamp. ***Excluding***
> ***special items, however, the company had a loss of 6 cents a share,*** while the
> FactSet consensus was for EPS of 10 cents. The news overshadowed a small
> revenue beat."

54.     By the commencement of this action, ADT shares continued to trade below $9 per

share, an over 35% decline from the $14 per share offering price.  All told, investor suffered

hundreds of millions of dollars in losses.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action on behalf of all who purchased or

otherwise acquired ADT common stock pursuant or traceable to the Registration Statement issued

in connection with the IPO (the "Class").  Excluded from the Class are Defendants and their

families, the officers and directors and affiliates of Defendants, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity

in which Defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and

can only be ascertained through appropriate discovery, Plaintiff believes that there are at least

thousands of members in the proposed Class.  Record owners and other members of the Class may

be identified from records maintained by ADT or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions.

57.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    (a)     whether Defendants violated the Securities Act;

    (b)     whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein;

    (c)     whether the prices of ADT securities were artificially inflated because of the Defendants' conduct complained of herein; and

    (d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### FIRST CAUSE OF ACTION

**For Violation of §11 of the Securities Act**
**Against All Defendants Except Apollo Global**

61.     Plaintiff incorporates all the foregoing by reference.

62.     This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except Apollo Global.

63.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

64.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

65.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

66.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

67.     Plaintiff acquired ADT shares pursuant to the Registration Statement.

68.     Plaintiff and the Class have sustained damages.  The value of ADT common stock has declined substantially subsequent to and due to Defendants' violations.

69.     At the time of their purchases of ADT shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of §12(a)(2) of the Securities Act
### Against All Defendants

70.     Plaintiff incorporates all the foregoing by reference.

71.     By means of the defective Prospectus, Defendants promoted, solicited, and sold ADT shares to Plaintiff and other members of the Class.

72.     The prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiff and

the other members of the Class who purchased ADT shares pursuant to the prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus as set forth above.

73.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the prospectus at the time Plaintiff acquired ADT shares.

74.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased ADT shares pursuant to the prospectus sustained substantial damages in connection with their purchases of the stock.  Accordingly, Plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to Defendants sued herein.  Class members who have sold their common stock seek damages to the extent permitted by law.

### THIRD CAUSE OF ACTION

**For Violation of §15 of the Securities Act**
**Against All Defendants**

75.     Plaintiff incorporates all the foregoing by reference.

76.     This Cause of Action is brought pursuant to §15 of the Securities Act against all Defendants.

77.     The Individual Defendants were controlling persons of ADT by virtue of their positions as directors or senior officers of ADT.  The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of ADT.  The Company controlled the Individual Defendants and all of ADT's employees.  Apollo Global and its affiliates were and remain the majority and controlling

shareholder(s) of ADT, controlled the appointment of ADT's officers and board of directors, took ADT private and then public again through the IPO, and exercised control over ADT, its officers, directors, and employees, and the underwriters of the IPO.

78.     ADT, Apollo Global, and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act alleged in the First and Second Causes of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Under Federal Rule of Civil Procedure 23, certifying this class action, appointing Plaintiff as a Class representative, and appointing Plaintiff's counsel Class Counsel;

B.     Awarding damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission, disgorgement, or such other equitable or injunctive relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands trial by jury.

DATED:  May 21, 2018                    Respectfully submitted,

HEDIN HALL LLP

By: /s/ Frank S. Hedin
        Frank S. Hedin

FRANK S. HEDIN (FBN 109698)
DAVID W. HALL*
1395 Brickell Ave, Suite 900
Miami, Florida 33131
Telephone:     (305) 357-2107
Facsimile:     (305) 200-8801

- 18 -

E-mail: fhedin@hedinhall.com
E-mail: dhall@hedinhall.com

**POMERANTZ LLP**
Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:      (212) 661-1100
Facsimile:      (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom*
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:      (312) 377-1181
Facsimile:      (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

*Pro Hac Vice* Application Forthcoming

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1. I, _Juan Perdomo_____, make this declaration pursuant to

Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the

Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation

Reform Act of 1995.

2. I have reviewed a Complaint against ADT Inc. ("ADT" or the "Company") and authorize

the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire ADT securities at the direction of plaintiffs' counsel or in

order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who

purchased or acquired ADT securities during the class period, including providing testimony at

deposition and trial, if necessary. I understand that the Court has the authority to select the most

adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in

ADT securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I

have not sought to serve as a representative party on behalf of a class under the federal securities

laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the

class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable

costs and expenses directly relating to the representation of the class as ordered or approved by the

Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed ___5_/_15_/_2018___
        **(Date)**

_____
        **(Signature)**

JUAN PERDOMO
_____
        **(Type or Print Name)**

**ADT INC. ("ADT")**                                                                                    **Perdomo, Juan**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|------|------------------|------------------------|------------------------|
| 1/19/2018 | Purchase | 90 | $14.0000 |