**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 18-80668-CV-MIDDLEBROOKS**

JUAN PERDOMO, Individually and on Behalf
of All Others Similarly Situated,                  **CLASS ACTION**

                              Plaintiff,           **JURY TRIAL DEMANDED**

vs.

ADT INC., et al.,

                              Defendants.
_____/

**AMENDED CLASS ACTION COMPLAINT**

        Lead Plaintiff Husam Assaf ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by and through his attorneys, allege the following based upon personal

knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other

matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

Such investigation included, among other things, a review of Defendants' public statements and

announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and press

releases published by and regarding ADT Inc. ("ADT" or the "Company"), securities analysts'

reports, news stories, witness interviews, and the review of other publicly available information.

Plaintiff believes that additional substantial evidentiary support exists for the allegations set forth

herein and will be available after a reasonable opportunity for discovery.

**I.       OVERVIEW OF THE ACTION**

        1.      This is a securities class action on behalf of all persons and/or entities that

purchased ADT common stock pursuant to and/or traceable to its initial public offering of

common stock, which closed on January 19, 2018 (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.　　　ADT is the leading provider of monitored security, interactive home and business automation, and related monitoring services in the United States and Canada. The Company installs security monitoring devices and offers professional monitoring for its customers. In May 2016, global alternative investment manager Apollo acquired ADT through a leveraged buyout. Following the acquisition, ADT was merged with two other Apollo-owned companies. And then, merely 19 months after it acquired ADT, Apollo took ADT public once again in the IPO.

3.　　　As discussed more fully below based upon the accounts of former Company employees, the prospectus and registration statement issued in connection with the Company's IPO (together, the "Registration Statement") was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

4.　　　Realizing that residential security business was saturated and not growing, ADT sought to expand into the do-it-yourself home security market with its product called the ADT Pulse. In part because ADT had dramatically trimmed its own internal product development team, the Company relied heavily on its collaboration with Zonoff, Inc. ("Zonoff") to develop a better software platform for the Pulse and develop other new products and technologies. The result of this collaboration was the Z1 platform, which had incorporated ADT's own intellectual property. However, as Zonoff's financial situation deteriorated, its CEO provided the Z1 platform to an emerging competitor, Ring, in exchange for employment for himself and other Zonoff employees. Using the fruits of the ADT-Zonoff collaboration, Ring sought to quickly

launch a product based on the ADT's own intellectual property to directly compete with the ADT Pulse.

5.     Although the IPO Registration Statement discussed ADT's technological developments, intellectual property, legal proceedings, and competitive landscape, Defendants failed to disclose apprise investors of the consequences of Ring's misappropriation of ADT's intellectual property, including that: (1) Ring was launching a product based on the Z1 platform and marketing the product as a direct competitor to ADT Pulse in an effort to take market share from ADT; (2) ADT had filed a lawsuit against Ring in an effort to retrieve the Z1 platform and stop Ring from selling any products based on the technology; and (3) although ADT had successfully obtained a preliminary injunction against Ring following trial, ADT had reached a settlement in principle that would allow Ring to keep the Z1 platform and launch a new product – the Ring Alarm – to compete with the ADT Pulse.

6.     Despite these developments that were highly material to ADT's business, the IPO Registration Statement failed to even mention Ring's misappropriation of the Z1 platform, ADT's lawsuit against Ring, or the emerging competitive threat from Ring. Moreover, the Registration Statement failed to comply with applicable SEC regulations because Defendants failed to disclose then-existing risks and uncertainties regarding these problems.

7.     As the truth was revealed regarding the foregoing issues, the trading price of ADT's stock declined substantially. On the date of the commencement of this action, May 21, 2018, ADT's stock price closed at $7.75 – approximately 55% of the IPO price. For these reasons, and those alleged more fully below, Plaintiffs and the other members of the Class have suffered damages as a result of Defendants' actions and omissions.

## II.     JURISDICTION AND VENUE

8.      The claims asserted herein arise under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v.

9.      Venue is also proper in this District under § 22 of the Securities Act, 15 U.S.C. § 77v(a), which provides that any suit under the Securities Act may be brought "in the district wherein the defendant is found or is an inhabitant or transacts business[.]" Many of the violations of law alleged herein occurred in this District, including the dissemination of the materially false and misleading statements complained of herein. Additionally, each of the Defendants also has sufficient contacts with this District, or otherwise purposefully availed himself or itself of benefits of this District, so as to render the exercise of jurisdiction over each by this District consistent with traditional notions of fair play and substantial justice.

## III.    PARTIES

### A.     Plaintiff

10.     Plaintiff Husam Assaf purchased ADT common stock pursuant and/or traceable to the Company's IPO and was damaged thereby. His certification pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") was previously filed with the Court. ECF No. 14-4.

### B.     Defendant ADT

11.     Defendant ADT sells and installs security monitoring devices for residences and business and is the leading provider of security monitoring services in the United States and Canada. ADT is incorporated under the laws of the state of Delaware and its headquarters are located in Boca Raton, Florida. ADT's origins trace back to 1874 as a telegraph company. After nearly 140 years of business and a series of acquisitions and spinoffs, ADT became a public company in September 2012. In May 2016, Defendant Apollo completed the acquisition of ADT

and took it private through a leveraged buyout. Following the IPO, ADT became a public company once again, with its shares listed on the New York Stock Exchange ("NYSE") under the ticker symbol "ADT."

### C. Individual Defendants

12. Defendant Timothy J. Whall ("Whall") was, at the time of the IPO, the Chief Executive Office ("CEO") and a director of the Company. In November 2018, Whall resigned as CEO, but he remains a director of the Company.

13. Defendant James D. DeVries ("DeVries") is, and was at the time of the IPO, the President and a director of the Company. As of December 1, 2018, following Whall's resignation, DeVries became the CEO of the Company.

14. Defendant Jeffrey Likosar ("Likosar") is, and was at the time of the IPO, the Executive Vice President and Chief Financial Officer ("CFO") of the Company.

15. Defendant P. Gray Finney ("Finney") is, and was at the time of the IPO, the Senior Vice President, Chief Legal Officer and Secretary of the Company.

16. Defendant Andrew D. Africk ("Africk") is, and was at the time of the IPO, a director of the Company. Africk was an Apollo employee for 21 years and was a Senior Partner when he left in 2013.

17. Defendant Marc E. Becker ("Becker") is, and was at the time of the IPO, a director of the Company and the Chairman of the Board. Becker was appointed to the Board as a designee of Apollo. At the time of the IPO, Becker was a Senior Partner of Apollo and an executive officer of TopCo Parent and AP VIII Holdings.

18. Defendant Reed B. Rayman ("Rayman") is, and was at the time of the IPO, a director of the Company. Rayman was appointed to the Board as a designee of Apollo. At the

time of the IPO, Rayman was a Principal of Apollo and an executive officer of TopCo Parent and AP VIII Holdings.

19.     Defendant Matthew H. Nord ("Nord") is, and was at the time of the IPO, a director of the Company.  Nord was appointed to the Board as a designee of Apollo. At the time of the, Nord IPO was a Senior Partner of Apollo.

20.     Defendant Eric L. Press ("Press") is, and was at the time of the IPO, a director of the Company. Press was appointed to the Board as a designee of Apollo. At the time of the IPO, Press was a Senior Partner of Apollo.

21.     Defendant Lee J. Solomon ("Solomon") is, and was at the time of the IPO, a director of the Company. Solomon was appointed to the Board as a designee of Apollo. At the time of the IPO, Solomon was a Partner of Apollo.

22.     Defendant Stephanie Drescher ("Drescher") is, and was at the time of the IPO, a director of the Company. Drescher was appointed to the Board as a designee of Apollo. At the time of the IPO, Drescher was a Senior Partner of Apollo.

23.     Defendant Brett Watson ("Watson") was at the time of the IPO a director of the Company.

24.     Defendant David Ryan ("Ryan") is, and was at the time of the IPO, a director of the Company.

25.     Defendants Whall, DeVries, Likosar, Finney, Africk, Becker, Rayman, Nord, Press, Solomon, Drescher, Watson, and Ryan are collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants, except for Defendant DeVries, signed the Registration Statement for the IPO either personally or through an attorney-in-fact and/or caused its issuance.

26.     The senior management of ADT, including Defendants Whall, DeVries, and Likosar (collectively, the "Executive Defendants"), as executive officers and authorized representatives of the Company, reviewed, drafted and approved the Registration Statement as well as the IPO's roadshow PowerPoint presentation, talking points, and script. Moreover, the Executive Defendants motivated in part to serve their own financial interests and the interests of the Company. For example, in January 2018, each of the Executive Defendants presented at IPO road shows conducted with the underwriters in an effort to persuade investors to purchase ADT common stock in the IPO.

**D.      The Apollo Defendants**

27.     Defendant Apollo Global Management, LLC ("Apollo"), a Delaware limited liability company headquartered in New York, New York, is a leading global alternative investment manager with offices across the United States, Canada, Europe and Asia. Before and after the IPO, Apollo beneficially owned 641,114,368 shares of ADT common stock through the various funds affiliated with or managed by Apollo:

a.      Defendant Prime Security Services TopCo Parent, L.P. ("TopCo Parent") is a Delaware limited partnership headquartered in Purchase, New York. Prior to the IPO, all 641,114,368 shares were held of record by TopCo Parent.

b.      Defendant Prime Security Services TopCo Parent GP, LLC ("TopCo GP") is a Delaware limited liability company headquartered in Purchase, New York, and is the general partner of TopCo Parent.

c.      Defendant AP VIII Prime Security Services Holdings, L.P. ("AP VIII Holdings") is a Delaware limited partnership headquartered in Purchase, New York. It is the sole member of TopCo GP and is a limited partner of TopCo Parent.

d.      Defendant AP VIII Prime Security Services Management, LLC ("AP VIII Management"), is a Delaware limited liability company headquartered in New York, New York. It is the investment manager of AP VIII Holdings and is a subsidiary of Apollo.

e.      Defendant Apollo Management, L.P. ("Apollo Management") is a Delaware limited partnership headquartered in New York, New York. It is the sole member of AP VIII Management and is a subsidiary of Apollo.

f.      Defendant Apollo Management GP, LLC ("Apollo Management GP") is a Delaware limited liability company headquartered in New York, New York. It is the general partner of Apollo Management and is a subsidiary of Apollo.

g.      Defendant Apollo Management Holdings, L.P. ("Apollo Management Holdings") a Delaware limited partnership headquartered in New York, New York. It is the sole member of Apollo Management GP and is a subsidiary of Apollo.

h.      Defendant Apollo Management Holdings GP, LLC ("Apollo Management Holdings GP") is a Delaware limited liability partnership headquartered in New York, New York. It is the general partner of Apollo Management Holdings and is a subsidiary of Apollo.

28.     Apollo, TopCo Parent, TopCo GP, AP VIII Holdings, AP VIII Management, Apollo Management, Apollo Management GP, Apollo Management Holdings, and Apollo Management Holdings GP (the "Apollo Defendants") collectively owned 100% of ADT's common stock prior to the IPO. After the IPO, the Apollo Defendants continued to own approximately 83.84% of ADT's common stock. Moreover, as detailed below, at the time of the IPO, six of ADT's ten directors were Apollo employees and designees of Apollo. In addition, one of the four non-Apollo directors is a former Apollo employee, who worked with Apollo for 21 years before leaving to start his own private investment company.

29.     By virtue of their ownership of the vast majority of ADT's stock and their designation of the majority of the members of ADT's board of directors (the "Board"), and as stated in the Registration Statement, the Apollo Defendants controlled ADT at the time of the IPO. Therefore, the Apollo Defendants either directly or indirectly controlled the contents of and/or dissemination of the Registration Statement.

### E.     Underwriter Defendants

30.     Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman Sachs & Co. LLC ("Goldman Sachs"), Barclays Capital Inc. ("Barclays"), Deutsche Bank Securities Inc. ("Deutsche Bank"), and RBC Capital Markets, LLC ("RBC") were the joint active book running managers of the IPO and representatives of the underwriters.

31.     Defendants Morgan Stanley and Goldman Sachs each agreed to purchase 18,375,000 shares of ADT common stock in the IPO, exclusive of their option to purchase additional shares.

32.     Defendant Barclays, Deutsche Bank, and RBC each agreed to purchase 11,550,000 shares of ADT common stock in the IPO, exclusive of their option to purchase additional shares.

33.     Defendant Apollo Global Securities, LLC ("Apollo Securities") was an underwriter for the IPO. Apollo Securities agreed to purchase 4,200,000 shares of ADT common stock in the IPO, exclusive of its option to purchase additional shares. Apollo Securities is an affiliate of Apollo and as a result, Apollo Securities was deemed to have a conflict of interest under FINRA Rule 5121 for its role as an underwriter in the IPO.

34.     Defendants Morgan Stanley, Goldman Sachs, Barclays, Deutsche Bank, RBC, and Apollo Securities are referred to hereinafter as the "Underwriter Defendants." In addition to the Underwriter Defendants, there were ten other underwriters for the IPO (the "Additional

Underwriters"), who agreed to purchase an aggregate of 29,400,000 shares of ADT common stock, exclusive of their option to purchase additional shares.

35.     The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. The Underwriter Defendants earned an aggregate of approximately $39.6 million in fees. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to market ADT stock in the IPO. The Underwriter Defendants arranged a roadshow prior to the IPO during which they, along with representatives of ADT including the Executive Defendants, met with potential investors and presented favorable information about the Company, its operation, and its financial prospects.

36.     The Underwriter Defendants also demanded and obtained an agreement from ADT that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

37.     Representatives of the Underwriter Defendants also assisted ADT, the Individual Defendants, and the Apollo Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations (the "due diligence investigation"). The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their due diligence investigation, the Underwriter Defendants had continual access to confidential corporate information concerning ADT's operations and financial prospects.

38.     Agents of the Underwriter Defendants met with ADT's lawyers, management, and top executives between at least September 2017 and January 2018 to decide: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which ADT stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures

ADT would make in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

39.     ADT, the Individual Defendants, the Apollo Defendants, and the Underwriter Defendants are collectively referred to hereinafter as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     ADT's Business and History

40.     ADT is the leading provider of monitored security, interactive home and business automation and related monitoring services in the United States and Canada. The Company installs security monitoring devices and offers professional monitoring for its customers. Although the Company does not differential its financial and operating information by segment, ADT operates in three markets: Residential, Commercial, and Growth Markets.

41.     ADT's origin dates back to 1874, when it was established as The American District Telegraph Company. The newly-formed company connected 50 residential homes to a telegraph-based call-box designed for the neighbors to signal for assistance to a central office in case of emergencies. Since its inception, ADT underwent significant growth and until 1980 when it entered the residential market, the cornerstone of the Company was its commercial business. In 1997, Tyco International acquired ADT and in 2012 spun off ADT as an independent public company. Following the spinoff, Tyco retained all of the commercial business and the rights to the ADT trademark outside of the United States and Canada.

42.     In May 2016, ADT once again became a private company when Defendant Apollo acquired the Company through a leveraged buyout. Following the acquisition, ADT was merged with two other Apollo-owned companies: Protection One, Inc. and ASG Intermediate Holding Corp. After about a year and a half, ADT once again became public when Apollo spun off the Company via the IPO.

43.     Currently, ADT operates in three markets: Residential, Commercial, and Growth Market. The residential market consists of homeowners, the commercial market consists of small and large business, and growth markets consists of potential customers in new industries in need of security services, such as smart home technologies, network and cyber security, and mobile security.

44.     Although the Company operates in these three markets, ADT reports its financial and operating information in one segment. ADT touts in the Registration Statement it has approximately 30% of the market share of the residential monitored security industry serving and is five times larger than the next largest residential competitor. Moreover, ADT serves 7.2 million residential and business customers and maintains the "industry's largest sales, installation, and service field force, as well as 24/7 professional monitoring network, all supported by 18,000 employees visiting approximately 10,000 homes and business daily." ADT generates 90% of revenue from recurring contractually-committed monthly payments for the professional monitoring services it provides its customers.

**B.     The Traditional Security Market Is Being Displaced**

45.     Although ADT states that 90% of its revenue is generated from contractually-committed services, the traditional professional monitoring services ADT offers are being disrupted by advances in technology and new offerings. In particular, new entrants are entering the professionally-monitored services market and companies are offering so-called "do-it-yourself" ("DIY") devices which allow consumers to monitor their homes themselves.

46.     The advancement of smart phones and tablets allow consumers immediate access to information and services. This immediate access allows consumers to stay connected with anything in their lives at all times. This capability has altered a number of traditional markets. For example, Amazon has drastically disrupted the traditional brick-and-mortar retail market,

and the home security industry is no exception. For instance, cable providers have now entered the market. Cable providers already provide consumers internet, telephone, and television services. Since they already have access to the consumers' connectivity, cable companies are beginning to offer professional security monitoring as well.

47.    In addition, DIY companies have entered the market by offering devices that allow the consumer to self-monitor their homes, thereby completely eliminating the need for professional monitoring services and the accompanying monthly fees. Specifically, in 2013, Bot Home Automation, Inc., doing business as Ring, disrupted the home security market by introducing a doorbell with a video camera that allowed users to monitor their home with their cell phone or tablet. The video doorbell was equipped with a motion sensor which sends a notification to the user's cellphone of any visitors and allowing the user to see, hear, and speak to the person at the door with the simple tap of a finger. Ring has since its grown its product offerings, all of which can be easily installed by the user, unlike ADT's products which required professional installation. Noticing the disruption to the security market, Amazon acquired Ring for $1 billion in February 2018.

48.    ADT was well aware of the threat to the security market by home automation and DIY devices. In 2010, the Company launched ADT Pulse, which allowed customers to use their smart phones, tablets, and laptops for certain functions such as arming and disarming their security systems, adjusting lights or the thermostat levels, view real-time video of their premises, and program customizable schedules for the management of a range of smart home products.

49.    In addition, in 2016, the Company introduced ADT Canopy, a month-to-month contract service providing professional security monitoring via compatible third-party DIY and

smart devices manufactured by Samsung, Honeywell, NETGEAR, as well as Apple's HomeKit and Amazon's Alexa.

**C.      ADT's Product and Technology Development Relied Heavily on Zonoff**

50.      CW1 was employed by ADT from July 2013 through August 2017. CW1 held various positions at ADT, including Director of Strategic Product Portfolio Optimization and Director of Product Launch. By the time CW1 left ADT, CW1 reported to the Chief Operations Officer, Dan Bresingham.

51.      CW1 stated that the residential security business was "saturated" and not growing. One way for ADT to increase revenue was to broaden the types of customers to whom ADT could sell products.

52.      CW1 explained that, before the Apollo acquisition, ADT had been working on expanding its product offering, including home automation products. Adding new products to the existing customer base could significantly increase customers' monthly payments to ADT. Although ADT had already been offering some home automation products, the Company sought to further develop such products as well as expand into areas outside of the traditional home security business.

53.      According to CW1, the product team had been working on several different products and partnerships before ADT was acquired by Apollo. One was a partnership that sought to replace mall guards with cameras that would be monitored by ADT employees in a monitoring center. Another was exploring ways of enhancing ADT's home automation capabilities, which included potential projects with Google and Amazon.

54.      CW1 stated that ADT was attempting to develop a new software platform for its Pulse system, a home-automation system with over one million customers. The ADT Pulse was

using software from a company called iControl that provided the consumer portal application as well as the back-end software.

55.     CW1 explained that the architecture of the iControl platform was unable to grow as fast as the number of customers who were adopting the Pulse system, leading to blackouts and crashes. The iControl software was "not stable."

56.     Additionally, the iControl platform was developed by the same company that developed the uControl platform that was being used by ADT's competitor, Comcast, for its Xfinity system. Indeed, Comcast, along with Alarm.com, acquired iControl in 2017. According to CW1, ADT's product team began to notice that when it asked for certain features to be built into the iControl platform, the same features started showing up in the uControl platform as well. For this reason, CW1 stated, ADT wanted to develop its own platform with Zonoff, so that ADT could be in control of its "own destiny" and not rely on a company that was also working with competitors.

57.     CW1 stated that ADT began working on two separate projects with Zonoff. The first was developing a new platform that would replace the iControl platform. The second was developing a home automation and security device — akin to Amazon Echo and Google Home — that could be placed on a counter in a customer's home. This second project involved both hardware and software development.

58.     According to CW1, before the Apollo acquisition, ADT had been making substantial investments in developing new products and working on partnerships with other companies to offer additional products to customers and to expand into other areas of business. After the acquisition, however, ADT's new management put a "halt" to most of these initiatives and "demolished" the product development team, including laying off most of its members.

59.     Specifically, as CW1 stated, there had been around 25 to 30 employees in the product development team, but all but three or four of them were let go by ADT after the Apollo acquisition. To the best of CW1's knowledge, most of the projects that the team was working on were "wrapped up" or "didn't go anywhere."

60.     CW1 explained that, given that the residential security business was saturated and that meaningful cost-cutting opportunities were limited, ADT could end up getting "stuck."

61.     Because ADT's new management demolished its product development team, the technologies and products that ADT developed with Zonoff were highly important for ADT's growth prospects, its ability to expand in the DIY home security market, and its ability to differentiate its products from those of its competitors.

### D.     ADT Entered Into a Collaboration with Zonoff

62.     Seeking to expand its product offerings in the DIY home security market, ADT identified Zonoff as a strategic business partner. Zonoff was a designer of home automation solutions, including software platforms for home automation and security.

63.     In November 2014, ADT and Zonoff entered into a collaboration to develop and design a home automation and security software platform and a retail home security and automation product for ADT. As part of this collaboration, ADT invested substantially in Zonoff through a stock purchase and a secured loan, and Zonoff granted ADT a first priority lien and security interest in all of its assets and intellectual property rights.

64.     Pursuant to a Master Services Agreement executed in November 2014 (the "MSA"), ADT and Zonoff agreed to collaborate in the development of what became the Z1 Platform and for Zonoff to provide software related services to ADT. Zonoff was required to develop a home security and automation platform — what became the Z1 platform — and related products that included support for professional monitoring by ADT, hosted video, and

were accessible via a mobile application or Web portal using Zonoff's cloud services platform. ADT was required to provide Zonoff access to ADT's intellectual property, confidential proprietary information, and trade secrets.

65.     The MSA gave ADT ownership of the deliverables and intellectual property created in connection with the ADT-Zonoff collaboration. Further, the MSA prohibited Zonoff using any ADT intellectual property to compete directly or indirectly with ADT.

66.     The ADT-Zonoff collaboration resulted in the development of the Z1 Platform, a home automation and security platform that was designed and developed by Zonoff for ADT, with funding and assistance from ADT, and incorporating certain of ADT's confidential, proprietary information, and trade secrets.

67.     Beginning in 2015, however, Zonoff began to experience financial challenges. Zonoff's cash flow was insufficient to fund its operations, including paying third-party development costs in connection with the ADT-Zonoff collaboration. Moreover, throughout the development process, Zonoff had significant difficulties meeting delivery milestones, which increased costs and delayed the release of the Z1 platform. Zonoff's inability to fund its operations and repay its loan obligations threatened the continuation of the collaboration and the development of the Z1 Platform.

68.     For purposes of continuing the development of the Z1 platform, ADT provided substantial funding to Zonoff in 2015 and 2016 and extended the time for Zonoff to pay interest due on its secured loan from ADT. In October 2016, Zonoff entered into a letter of intent regarding a potential acquisition of Zonoff by a third party. This acquisition, if completed, would have ensured Zonoff's ability to continue its collaboration with ADT and safeguarded ADT's

intellectual property. In November 2016, ADT agreed to provide another secured loan as bridge financing to sustain Zonoff through the closing of the potential acquisition.

### E.   Ring Misappropriated ADT's Intellectual Property from Zonoff

69.   Zonoff's financial condition continued to deteriorate throughout 2016. Despite ADT's funding, as of January 2017, Zonoff would not be able to survive as an independent concern.

70.   Instead of completing the potential acquisition of Zonoff, its CEO, Michael Harris ("Harris"), engineered the transfer of the Z1 platform to ADT's competitor, Ring. ADT was unaware of these efforts until it was too late. Ring obtained ADT's confidential, proprietary information and trade secrets that had been incorporated into the Z1 Platform without paying any compensation to ADT. In exchange, Ring hired Zonoff's development team and named Harris the President of a new division called "Ring Solutions."

71.   An emerging Silicon Valley technology company, Ring developed and produced consumer electronic home security products and services, including a video doorbell, motion detectors, and related products that provided for remote, mobile monitoring, and control of customers' homes. Ring sought to compete directly with ADT by offering a professionally monitored home security and automation software platform. In 2017, Ring had more than one million users and was valued at approximately $769 million. Although the public was expecting Ring to eventually launch an IPO, Ring was engaged in private discussions to be acquired by Amazon. Amazon's acquisition of Ring for $1 billion was announced on February 27, 2018 and completed in April 2018.

72.   Starting in and around January 2017, Harris began to negotiate Ring's hiring of himself and other Zonoff employees in exchange for the Z1 platform. To facilitate this transaction, on January 30, 2017, Harris surreptitiously entered into a technology license and

development agreement with Ring. He also went took efforts to fatally undermine the potential acquisition of Zonoff.

73.     In February 2017, Harris had a back-up of the Z1 Platform saved on a portable hard drive. As soon as the potential acquisition of Zonoff collapsed, Ring's CEO flew from California to Zonoff's Pennsylvania headquarters, took possession of the portable hard drive containing the Z1 platform, and offered new positions to Harris and Zonoff's employees.

74.     Zonoff ceased operations in March 2017. Within days, Ring had hired most, if not all, of Zonoff's former employees, including its software development team, leased Zonoff's office space, and went back to developing the Z1 platform — but this time for Ring, not for ADT.

75.     ADT subsequently learned that Ring had misappropriated the Z1 platform and was developing a product using this technology — which incorporated ADT's intellectual property — that would directly compete with ADT in the professionally monitored home security market. Indeed, on October 2, 2017, Ring announced launch of Ring Protect, a professionally monitored home security system based on the Z1 platform.

76.     Ring, which previously had no presence in the professionally monitored home security business, obtained a short-cut to market by seizing the fruits of ADT's efforts, funds, time, and risk. Instead of spending tens of millions of dollars over a period of years developing a competing product, for the comparatively minuscule price of hiring Zonoff's employees and leasing its office space, Ring had suddenly purchased essentially the same technology that ADT had developed through its collaboration with Zonoff. Worse for ADT, Ring, acquired by Amazon and suddenly flush with resources, ultimately went to market with a competing product that was cheaper than the ADT Pulse.

19

### F.      ADT Files a Lawsuit for the Return of the Z1 Platform

77.     In April 2017, ADT commenced a lawsuit in Delaware Chancery Court against Harris and Ring (the "Zonoff Litigation"). ADT alleged misappropriation of trade secrets, tortious interference with contractual relationship, conversion, and fraudulent transfer. Further, ADT sought not only compensatory damages but also the return of the Z1 platform.

78.     In a complaint filed in May 2017, ADT alleged that Ring had taken wrongful possession of the Z1 platform, in which "ADT invested substantial funds, to use in competition with ADT." Additionally, ADT alleged that "Ring's continued possession and use of the Z1 Platform is causing and will continue to cause ADT irreparable injury, including, but not limited to, the material and substantial impairment of ADT's rights and interests in and to the Z1 Platform [and] the protection of its trade secrets[.]"

79.     After discovery was completed in the Zonoff Litigation, ADT rejected Harris and Ring's settlement offer of $12.5 million. In September 2017, the case was tried. Following trial, ADT sought a preliminary injunction to stop Ring from selling any products that used the Z1 platform.

80.     In its preliminary injunction motion, ADT stated that, "Ring is competing directly and explicitly with ADT, using the improperly acquired source code as the foundation of a new product." Further, ADT showed that Ring's competitive threat was not speculative: "[I]t is expressly confirmed by Ring's own marketing materials. Ring not only compares its product to ADT's Pulse offering, but specifically touts the savings customers can realize by using 'Ring Protect' rather than Pulse."

81.     As ADT pointed out, the Ring Protect was using "the software platform specifically developed by ADT and Zonoff for Pulse." Thanks to its improper deal with Harris, Ring obtained, along with ADT's intellectual property, "a two-year, $50 million head start on its

entry into the professionally monitored segment of the home security industry." "Ring has been able to skip over the trials and errors, the resources consumed, and hours devoted by companies like ADT to put out a competing product in a fraction of the time, using technology developed and paid for by ADT."

82.     On November 2, 2017, the Delaware Chancery Court granted ADT's motion for a preliminary injunction. Finding that it was reasonably probable that Ring was improperly using the Z1 platform, the court prohibited Ring from selling any products based on the platform. Among other things, the court stated that while "ADT doesn't have a right to avoid competition . . . it's another thing when that competitor has emerged by virtue of the misuse of someone else's property, which is what there's a reasonable probability of success and good reason to think happened here." Thus, the court concluded that, "I think there is irreparable harm to ADT."

83.     On December 15, 2017, while awaiting adjudication of the Zonoff Litigation, the parties filed a letter with the court advising that they had reached a settlement in principle. The letter did not disclose the terms of the settlement in principle, however.

84.     On the day of ADT's IPO, on January 19, 2018, the parties filed another letter with the court advising that they were still finalizing the terms of the settlement. The parties stated their belief that they were "close" to finalizing an agreement, while again not disclosing the terms of the settlement in principle.

85.     Just weeks after ADT's IPO was completed, on February 23, 2018, the parties informed the court that they had finalized a settlement agreement. Although the parties once again did not disclose the terms of the settlement, they filed a stipulation that vacated the preliminary injunction against Ring.

86.     The media reported that the settlement involved a $25 million payment to ADT, but, critically, did not involve the return of the Z1 platform to ADT. Thus, Ring would be allowed to launch a competing product based on the Z1 platform after all.

87.     In June 2018, Ring launched the Ring Alarm — essentially the Ring Protect that was the focus of the Zonofff Litigation and that caused irreparable harm to ADT. The Ring Alarm included professional monitoring for only $10 per month, much less than the $30 to $60 per month charged by ADT.

**G.     Defendants Complete ADT's IPO**

88.     On September 28, 2017, ADT filed with the SEC its registration statement on Form S-1. After ADT filed four amendments to the Form S-1, the last of which was filed on January 17, 2018, the SEC declared the registration statement effective on January 18, 2018.

89.     On January 18, 2018, ADT announced its IPO of 105 million shares of common stock at $14.00 per share. Further, ADT granted to the underwriters a 30-day option to purchase up to an additional 15.75 million shares of common stock at the IPO price.

90.     The IPO shares were sold pursuant to a prospectus dated January 18, 2018 and filed with the SEC on January 22, 2018. (The prospectus and registration statement are referred collectively herein as the "Registration Statement.")

91.     ADT closed its IPO on January 23, 2018. The Company received gross proceeds of approximately $1.47 billion and net proceeds of $1.415 billion. ADT used approximately $649 million of the net proceeds from the IPO to voluntarily redeem $594 million of debt and set aside $750 million to redeem outstanding preferred securities.

**H.     Investors Learn the Full Extent of Ring's Competitive Threat**

92.     In the period leading to the IPO, the central allegations of the Zonoff Litigation – that Ring had misappropriated ADT's intellectual property, including the Z1 platform – were

filed with the Delaware Chancery Court. After a trial had been completed, however, the court granted ADT's request for a preliminary injunction, concluding that ADT had shown a reasonable probability that Ring was improperly using ADT's intellectual property. The court had prohibited Ring from selling any product that was based on the Z1 platform until the case was adjudicated. This development had materially diminished the risk that Ring would be able to introduce a competing product incorporating ADT's own technology.

93.     On the date that the IPO launched, there were unconfirmed internet reports about the terms of the Zonoff Litigation settlement. Certain websites stated that, as part of the settlement, Ring would pay ADT $25 million but would not be required to return the Z1 platform. The term of the settlement allowing Ring to keep the Z1 platform was not confirmed until February 23, 2018, however, when the parties filed a stipulation to vacate the preliminary injunction.

94.     Nonetheless, these unconfirmed reports had an immediate adverse effect on the price of ADT's stock price after the IPO. On its first day of trading, January 19, 2018, the price of ADT stock fell from the IPO price of $14.00 to close at $12.39.

95.     On February 27, 2018, just four days after ADT stipulated to withdraw the preliminary injunction against Ring, allowing Ring once again to sell products based on the Z1 platform that would compete directly with ADT, Amazon announced that it was acquiring Ring for $1 billion. This development amplified Ring's competitive threat to ADT. Now backed by Amazon's ample financial resources, Ring could aggressively compete with ADT on price. Indeed, when Ring launched the Ring Alarm in June 2018, it offered professional monitoring for only $10 per month, much less than the $30 to $60 per month charged by ADT. Moreover, Ring would have privileged access to Amazon's almost 100 million Prime members.

96.     In reaction to this news, ADT's stock price declined further to a closing price of $10.56 on February 28, 2018.

97.     Before the market open on March 15, 2018, ADT released its financial results for the fourth quarter and fiscal year 2017 – the Company's first quarterly report following the IPO. The results were highly disappointing. Although ADT reported fourth quarter net income of $638 million and diluted earnings per share of $0.99, they were inflated by a $690 million tax benefit due to the tax reform law enacted in 2017. Excluding this and other special items, ADT reported negative earnings – specifically diluted earnings per share of -$0.06.

98.     Also before the market open on March 15, 2018, ADT held an earnings conference call. During this call, a Morgan Stanley analyst asked: "Could you talk about the potential impact that you see from Amazon's acquisition of Ring? Do you think that this increases the threat from new tech offerings, just given Amazon's scale?" Defendant Whall begrudgingly had to acknowledge that, "Yes, I think you see a little difference -- a little change in the competitive landscape. When we were trying to put this deal together a few years ago, it was more AT&T, Verizon, Time Warner, Comcast coming in more of a service offering. Now you see Google Nest coming out there with products. You see Amazon, potentially Apple coming out more on the hardware side and kind of getting things started with more of a DIY offering, if you will."

99.     In reaction to this news, ADT's stock price declined even further to a closing price of $8.73 on March 16, 2018.

100.    On the date that this action was commenced, on May 21, 2018, ADT's stock price closed at $7.75 – approximately 55% of the IPO price.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND ACTIONABLE OMISSIONS IN ADT'S IPO REGISTRATION STATEMENT

101.    ADT's IPO Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

102.    Specifically, the Registration Statement failed to disclose that: (1) ADT had dramatically cut back on its internal product development team; (2) consequently, ADT had been relying heavily on Zonoff to develop a new platform for its ADT Pulse and other new products and technologies; (3) Ring had misappropriated ADT's intellectual property, including the Z1 platform, that ADT and Zonoff had developed during their collaboration; (4) Ring was launching a product based on the Z1 platform and marketing the product as a direct competitor to ADT Pulse in an effort to take market share from ADT; (5) ADT had filed a lawsuit against Ring in an effort to retrieve the Z1 platform and stop Ring from selling any products based on the technology; and (6) although ADT had successfully obtained a preliminary injunction against Ring following trial, ADT had reached a settlement in principle that would allow Ring to keep the Z1 platform and launch a new product – the Ring Alarm – to compete with the ADT Pulse.

103.    Thus, the Registration Statement did not provide a complete and accurate picture of ADT's ability to compete in the DIY home security market. Moreover, the Registration Statement failed to apprise investors of the risks facing ADT regarding its competition, intellectual property, and legal proceedings.

104.    Further, under applicable SEC rules and regulations, including Item 303 of SEC Regulation S-K, the IPO Registration Statement was required to disclose known trends, events, or uncertainties that were having or were reasonably likely to have an unfavorable impact on the

Company's net sales, revenue, or income from continuing operations. Item 303 imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." S.E.C. Release No. 6835, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a)(3). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required. *Id.*

105.    Pursuant to Item 303(a), a registrant thus has an affirmative duty to:

a.    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected; and

b.    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

106.    Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed. Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

107.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See* Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the

company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *Id.* at \*3, \*17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at \*11 (December 19, 2003).

108.    The Registration Statement was also required to disclose certain risk factors under SEC Regulation S-K, Item 503. Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Sec. Offering Reform*, S.E.C. Release No. 8501, 2004 WL 2610458, at \*86 (Nov. 3, 2004). Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 CFR § 229.503(c). The discussion of risk factors "must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment." *Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers*, 1998 WL 425894, at \*14 (July 29, 1998).

109.    ADT's IPO Registration Statement violated Items 303 and 503 of Regulation S-K because it failed to disclose the existing risks and uncertainties regarding ADT's intellectual property, legal proceedings, and competition.

**A.**    **Representations Regarding ADT's Technological Development, Intellectual Property and Legal Proceedings Were Actionable Because They Failed to Disclose Ring's Theft of the Z1 Platform and the Ensuing Zonoff Litigation**

110.    The Registration Statement contained the following representations regarding technological changes in ADT's industry:

> ***Our future growth is dependent upon our ability to keep pace with rapid technological and industry changes in order to develop or acquire new technologies for our products and service introductions that achieve market acceptance with acceptable margins.***
>
> Our business operates in markets that are characterized by rapidly changing technologies, evolving industry standards, potential new entrants, and changes in customer needs and expectations. For example, a number of cable and other telecommunications companies and large technology companies with home automation solutions offer interactive security services that are competitive with our products and services. If these services gain greater market acceptance and traction, our ability to grow our business, in particular our ADT Pulse and other interactive service offerings, could be materially and adversely affected. <u>Accordingly, our future success depends in part on our ability to accomplish the following: identify emerging technological trends in our target end-markets; develop, acquire, and maintain competitive products and services that capitalize on existing and emerging trends; enhance our existing products and services by adding innovative features on a timely and cost-effective basis that differentiates us from our competitors; sufficiently capture intellectual property rights in new inventions and other innovations; and develop or acquire and bring products and services, including enhancements, to market quickly and cost-effectively. Our ability to develop or acquire new products and services that are technologically innovative requires the investment of significant resources and can affect our competitive position.</u> These acquisition and development efforts divert resources from other potential investments in our businesses, and they may not lead to the development of new commercially successful technologies, products, or services on a timely basis. Moreover, as we introduce new products and services, we may be unable to detect and correct defects in the product or in its installation, which could result in loss of sales or delays in market acceptance. New or enhanced products and services may not satisfy customer preferences and potential product failures may cause customers to reject our products. As a result, these products and services may not achieve market acceptance and our brand image could suffer. In addition, our competitors may introduce superior products or business strategies, impairing our brand and the desirability of our products and services, which may cause customers to defer or forego purchases of our products and services, and impacting our

ability to charge monthly service fees. If our competitors implement new technologies before we are able to implement them, those competitors may be able to provide more effective products than ours, possibly at lower prices. Any delay or failure in the introduction of new or enhanced solutions could harm our business, results of operations and financial condition.

In addition, the markets for our products and services may not develop or grow as we anticipate. The failure of our technology, products, or services to gain market acceptance, the potential for product defects, or the obsolescence of our products and services could significantly reduce our revenue, increase our operating costs, or otherwise materially adversely affect our business, financial condition, results of operations and cash flows. In addition to developing and acquiring new technologies and introducing new offerings, we may need, from time to time, to phase out outdated and unsuitable technologies and services. See "—Shifts in our customers' choice of, or telecommunications providers' support for, telecommunications services and equipment could materially adversely affect our business and require significant capital expenditures." If we are unable to do so on a cost effective basis, we could experience reduced profits.

111.    In addition, the Registration Statement contained the following representations regarding the infringement of ADT's intellectual property rights:

### Infringement of our intellectual property rights could negatively affect us.

We rely on a combination of patents, copyrights, trademarks, trade secrets, confidentiality provisions, and licensing arrangements to establish and protect our proprietary rights. We cannot guarantee, however, that the steps we have taken to protect our intellectual property rights will be adequate to prevent infringement of our rights or misappropriation of our intellectual property or technology. Adverse events affecting the use of our trademarks could affect our use of those trademarks and negatively impact our brands. In addition, if we expand our business outside of the United States and Canada in the future, effective patent, trademark, copyright, and trade secret protection may be unavailable or limited in some jurisdictions. Furthermore, while we enter into confidentiality agreements with certain of our employees and third parties to protect our intellectual property, such confidentiality agreements could be breached or otherwise may not provide meaningful protection for our confidential information, trade secrets and know-how related to the design, manufacture, or operation of our products and services. If it becomes necessary for us to resort to litigation to protect our intellectual property rights, any proceedings could be burdensome and costly, and we may not prevail. Further, adequate remedies may not be available in the event of an

unauthorized use or disclosure of our confidential information, trade secrets, or know-how. If we fail to successfully enforce our intellectual property rights, our competitive position could suffer, which could materially adversely affect our business, financial condition, results of operations, and cash flows.

112.   Further, the Registration Statement contained the following representations regarding ADT's legal proceedings:

[W]e are currently and may in the future become subject to legal proceedings and commercial or contractual disputes. These are typically claims that arise in the normal course of business including, without limitation, commercial or contractual disputes with our suppliers, intellectual property matters, third party liability, including product liability claims and employment claims. There is a possibility that such claims may have a material adverse effect on our results of operations that is greater than we anticipate and/or negatively affect our reputation.

*        *        *

The Company is subject to various claims and lawsuits in the ordinary course of business, including from time to time, contractual disputes, employment matters, product and general liability claims, claims that the Company has infringed on the intellectual property rights of others, claims related to alleged security system failures, and consumer and employment class actions. In the ordinary course of business, the Company is also subject to regulatory and governmental examinations, information requests and subpoenas, inquiries, investigations, and threatened legal actions and proceedings. In connection with such formal and informal inquiries, the Company receives numerous requests, subpoenas, and orders for documents, testimony, and information in connection with various aspects of its activities. The Company has recorded accruals for losses that it believes are probable to occur and are reasonably estimable. While the ultimate outcome of these matters cannot be predicted with certainty, the Company believes that the resolution of any such proceedings (other than matters specifically identified below), will not have a material adverse effect on its financial position, results of operations, or cash flows.

113.   The foregoing representations contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of the Registration Statement because they failed to disclose that: (1) ADT had

dramatically cut back on its internal product development team; (2) consequently, ADT had been relying heavily on Zonoff to develop a new platform for its ADT Pulse and other new products and technologies; (3) Ring had misappropriated ADT's intellectual property, including the Z1 platform, that ADT and Zonoff had developed during their collaboration; (4) Ring was launching a product based on the Z1 platform and marketing the product as a direct competitor to ADT Pulse in an effort to take market share from ADT; (5) ADT had filed a lawsuit against Ring in an effort to retrieve the Z1 platform and stop Ring from selling any products based on the technology; and (6) although ADT had successfully obtained a preliminary injunction against Ring following trial, ADT had reached a settlement in principle that would allow Ring to keep the Z1 platform and launch a new product – the Ring Alarm – to compete with the ADT Pulse.

### B. Representations Regarding ADT's Competition Were Actionable Because They Failed to Disclose Ring's Theft of the Z1 Platform to Launch a Product to Compete Directly With the ADT Pulse

114.   The Registration Statement contained the following representations regarding competition:

> ***We sell our products and services in highly competitive markets, including the home automation market, which may result in pressure on our profit margins and limit our ability to maintain or increase the market share of our products and services.***
>
> The monitored security industry is highly fragmented and subject to significant competition and pricing pressures. We experience significant competitive pricing pressures on installation, monitoring, and service fees. Several competitors offer installation fees that match or are lower than ours. Other competitors charge significantly more for installation, but in many cases, less for monitoring. In addition, cable and telecommunications companies have expanded into the monitored security industry and are bundling their existing offerings with monitored security services.
>
> In many cases, we face competition for direct sales from our independent, third-party authorized dealers, who may offer installation for considerably less than we do in particular markets. We believe that the monitoring and service fees we offer are generally competitive with rates offered by other

security service providers. We face competition from other providers such as cable and telecommunications companies that may have existing access to and relationship with subscribers and highly recognized brands, which may drive increased awareness of their security/automation offerings relative to ours, have access to greater capital and resources than us, and may spend significantly more on advertising, marketing, and promotional resources, any of which could have a material adverse effect on our ability to drive awareness and demand for our products and services. In particular, these companies may be able to offer subscribers a lower price by bundling their services. We also face potential competition from DIY products, which enable customers to self-monitor and control their environments without third-party involvement through the Internet, text messages, emails, or similar communications, but with the disadvantage that alarm events may go unnoticed. Some DIY providers may also offer professional monitoring with the purchase of their systems and equipment without a contractual commitment, which may be attractive to some customers and put us at a competitive disadvantage. Other DIY providers may offer new IoT devices and services with automated features and capabilities that may be appealing to customers. Shifts in customer preferences towards DIY systems could increase our attrition rates over time and the risk of accelerated amortization of customer contracts resulting from a declining customer base. It is possible that one or more of our competitors could develop a significant technological advantage over us that allows them to provide additional service or better quality service or to lower their price, which could put us at a competitive disadvantage. Continued pricing pressure, improvements in technology, and shifts in customer preferences towards self-monitoring or DIY could adversely impact our customer base and/or pricing structure and have a material adverse effect on our business, financial condition, results of operations, and cash flows.

*    *    *

**Competition**

Technology trends are creating significant change in our industry. Innovation has lowered the barriers to entry in the interactive services and automation market, and new business models and competitors have emerged. We believe that a combination of increasing customer interest in lifestyle and business productivity and technology advancements will support the increasing penetration of the interactive services and automation industry. We are focused on extending our leadership position in the monitored security industry while also growing our share of the fast-growing interactive automation industry. The security systems market in the United States and Canada remains highly competitive and fragmented, with a number of major firms and thousands of smaller regional and local

companies. The high fragmentation of the industry is primarily the result of relatively low barriers to entering the business in local geographies and the availability of wholesale monitoring (whereby smaller companies outsource their monitoring to operations that provide monitoring services but do not maintain the customer relationship). We believe that our principal competitors within the security systems market are Johnson Controls International plc., Vivint, Inc., Stanley Security Solutions, a subsidiary of Stanley Black and Decker, MONI, a subsidiary of Ascent Capital Group, Inc. and Comcast Corporation.

Success in acquiring new customers is dependent on a variety of factors, including brand and reputation, market visibility, service and product capabilities, quality, price, and the ability to identify and sell to prospective customers. Competition is often based primarily on price in relation to the value of the solutions and service. Rather than compete purely on price, we emphasize the quality of our services, which we believe is distinguished by superior-class customer service, the reputation of our industry-leading brands, and our knowledge of customer needs, which we believe collectively enable us to deliver an outstanding experience. In addition, we are increasingly offering added features and functionality, such as those in our ADT Pulse interactive services offering, which provide new services and capabilities that serve to further differentiate our offering and support a pricing premium.

We believe our focus on safety and security, coupled with our field sales force, and including our nationwide team of in-home sales consultants, our solid reputation for and expertise in providing reliable security and monitoring services through our in-house network of redundant monitoring centers, our reliable product solutions, and our highly skilled installation and service organization, position us well to compete with traditional and new competitors.

115.    The foregoing representations contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of the Registration Statement because they failed to disclose that: (1) an emerging competitor, Ring, had misappropriated ADT's intellectual property, including the Z1 platform, that ADT and Zonoff had developed during their collaboration; (2) Ring was launching a product based on the Z1 platform and marketing the product as a direct competitor to ADT Pulse in an

effort to take market share from ADT; (3) ADT had filed a lawsuit against Ring in an effort to retrieve the Z1 platform and stop Ring from selling any products based on the technology; and (4) although ADT had successfully obtained a preliminary injunction against Ring following trial, ADT had reached a settlement in principle that would allow Ring to keep the Z1 platform and launch a new product – the Ring Alarm – to compete with the ADT Pulse.

## VI.   CLASS ACTION ALLEGATIONS

116.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all persons or entities that purchased or otherwise acquired ADT common stock issued pursuant to and/or traceable to the Company's IPO (the "Class"), and were damaged thereby. Excluded from the Class are each of the Defendants, their respective successors, assigns, parents and subsidiaries, the past and current executive officers and directors of ADT, Apollo, and the Underwriter Defendants, the legal representatives, heirs, successors or assigns of the Individual Defendants, and any entity in which any of the foregoing excluded persons have or had a majority ownership interest.

117.   The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiff at this time, but it is believed to be in the thousands. Members of the Class may be identified by records maintained by ADT or its transfer agents and may be notified by the pendency of this action by mail, using a form of notice customarily used in securities class actions.

118.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

119.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

120.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are"

     a.   whether Defendants violated the federal securities laws as alleged herein;

     b.   whether the Registration Statement issued by Defendants to the investing public omitted and/or misrepresented material facts about ADT and its business, operations, or prospects; and

     c.   whether the members of the Class have sustained damages and, if so, the proper measure of damages.

121.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**VII.    COUNTS**

**<u>COUNT I</u>**

**FOR VIOLATION OF §11 OF THE SECURITIES ACT**
**(Against all Defendants Except DeVries)**

122.     Plaintiff repeats and realleges each and every allegation contained above. Plaintiff specifically disclaims any allegations that are based upon fraud, recklessness, or intentional misconduct.

123.     This count is brought by Plaintiff pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except DeVries. The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement; signed the Registration statement; and/or were directors, underwriters or selling stockholders who are appropriate defendants in this Count.

124.     This claim is brought by Plaintiff on his own behalf and on behalf of other members of the Class who purchased or otherwise acquired ADT common stock pursuant to and/or traceable to the Company's IPO. Each Class member acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Registration Statement. ADT is the issuer of the common stock through the Registration Statement. The Individual Defendants except for Defendant DeVries are signatories to the Registration Statement.

125.     The Underwriter Defendants owed to the holders of shares obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants named in this Count knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, Defendants named in this Count are liable to the Class.

126.    Defendants named in this Count owed to the purchasers of the shares obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

127.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein no misleading.

128.    Defendants named in this Count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public that were contained in the Registration Statement, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reason of the conduct alleged herein, Defendants named in this Count violated and/or controlled a person who violated §11 of the Securities Act.

129.    At the times they obtained their shares of ADT, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

130.    By reason of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11 as measured by the provisions of §11(e), from the Defendants named in this Count and each of them, jointly and severally.

## COUNT II

### FOR VIOLATION OF §15 OF THE SECURITIES ACT
(Against the Individual Defendants and the Apollo Defendants)

131.    Plaintiff repeats and realleges each and every allegation contained above. Plaintiff specifically disclaims any allegations that are based upon fraud, recklessness, or intentional misconduct.

132.    This Count is brought by Plaintiff against the Individual Defendants and the Apollo Defendants pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class.

133.    This Count is asserted against the Individual Defendants and the Apollo Defendants, each of whom was a control person of ADT during the relevant time period. The Individual Defendants and Apollo Defendants were control persons of ADT by virtue of their positions as directors and/or senior officers of the Company, as well as their status as stockholders and their ability to cause the Company to arrange and execute the IPO and disseminate the Registration Statement in connection therewith.

134.    The Defendants named in this Count were in positions to control, and did control, the false and misleading statements and omissions contained in the Registration Statement.

135.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

136.    Plaintiffs and the Class have sustained damages. The value of ADT common stock has declined substantially due to the Securities Act violations alleged herein.

137.    By reason of the above conduct, for which ADT is primarily liable, as set forth above, the Individual Defendants and the Apollo Defendants are jointly and severally liable with and to the same extent as ADT pursuant to §15 of the Securities Act.

## VIII.   PRAYER FOR RELIEF

138.    Plaintiff demands judgment against Defendants as follows:

    a.   determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives and certifying lead counsel as class counsel;

    b.   requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

    c.   awarding Plaintiff and the Class prejudgment and post-judgment interest, as well as their reasonable counsel fees and expert fees, and other costs and expenses reasonably incurred by this action; and

    d.   awarding such other relief as the Court may deem just and proper.

## IX.   JURY TRIAL DEMANDED

139.    Plaintiff hereby demands a trial by jury.

Dated: January 15, 2019

Respectfully submitted,

**DESMOND LAW FIRM, P.C.**

*/s/ Leo W. Desmond*
    Leo W. Desmond, Esq.
    Florida Bar No. 0041920
5070 Highway A1A, Suite D
Vero Beach, Florida 32963
Telephone: (772) 231-9600
Facsimile: (772) 231-0300
lwd@DesmondLawFirm.com

*Liaison Counsel for Lead Plaintiff and the Class*

**GLANCY PRONGAY & MURRAY LLP**
Joshua L. Crowell
Vahe Mesropyan
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
jcrowell@glancylaw.com
vmesropyan@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*

**THE SCHALL LAW FIRM**
Brian Schall, Esq.
1880 Century Park East, Suite 404
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff and the Class*